AO 91 (Rev. 11/11) Criminal Complaint (approved by AUSA Justin Ashenfelter) 21-068

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| United States of America <br> v. <br> DARNELL JACKSON <br> a/k/a "Major Change" <br><br> *Defendant(s)* | ) ) ) ) ) ) ) <br> Case No. 21-mj-1192 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   July 19, 20, and 21, 2021   in the county of   Philadelphia   in the   Eastern   District of   Pennsylvania  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1958 | Use of interstate commerce facilities in the commission of murder-for-hire |
| 18 U.S.C. § 922(g)(1) | Possession of ammunition by a felon |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

/s/ John Krewer
*Complainant's signature*

John Krewer, Task Force Officer (FBI)
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/22/2021

/s/ Richard A. Lloret
*Judge's signature*

City and state:   Philadelphia, Pennsylvania   Hon. Richard A. Lloret, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT**

I, John Krewer, being duly sworn, depose and state that:

I.      **INTRODUCTION AND BACKGROUND**

1.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"), Philadelphia Field Division and have been assigned there since November of 2015, before this assignment I was in the Criminal Intelligence Unit within the Philadelphia Police Department from 2014 to 2015, before Criminal Intelligence I was a uniformed Police Officer in the 12th Police District since 2009. I have received specialized training from the FBI, DEA, ATF, Pennsylvania Attorney General's Office and the Philadelphia Police Department including training in the investigation and identification of narcotics traffickers and violent gangs. During my tenure with the FBI, I have been assigned to the High Intensity Drug Trafficking Area ("HIDTA")/Safe Streets Violent Drug Gang Task Force ("SSVDGTF") of the Philadelphia Division, which investigates, among other violations of federal law, violent drug gangs and criminal organizations including those involved in the importation, distribution, and manufacturing of controlled substances, Hobbs Act violations, outlaw motorcycle gangs, and homicides and shootings resulting from the drug trade.  While a Task Force Officer, I have investigated numerous firearms violations, drug trafficking violations, and other related crimes. I have conducted physical and electronic surveillance, debriefed confidential sources, analyzed

1

information obtained from court-authorized pen register and trap and trace intercepts, and participated in the drafting and execution of search warrants involving these matters.

2. This affidavit is made in support of an arrest warrant for, and criminal complaint against, DARNELL JACKSON a/k/a "Major Change," where there is probable cause to believe that: (1) JACKSON, with the intent that a murder be committed in violation of the laws of the Commonwealth of Pennsylvania, that is, Title 18, Pennsylvania Consolidated Statutes Annotated, Sections 2502 and 306, as consideration for the receipt of, and as consideration for a promise and agreement to pay, things of pecuniary value, to wit, U.S. currency, used a facility of interstate commerce, to wit, a cellular phone, in violation of Title 18, United States Code, Section 1958 (use of interstate commerce facilities in the commission of murder-for-hire); and (2) JACKSON, upon having been previously convicted in the Commonwealth of Pennsylvania of a crime punishable by more than one year in prison, possessed ammunition, which traveled in and affected interstate commerce, in violation of Title 18, United States Code, Section 922(g)(1) (possession of ammunition by a felon).

3. The information contained in this affidavit is based upon my personal knowledge and observations, the observations and personal knowledge of other law enforcement officers, and information provided to law enforcement officers. Because this affidavit is submitted for the limited purpose of establishing probable cause, this affidavit does not set forth each and every fact known to me or other agents regarding this investigation. Where conversations are related herein, they are related in substance and in relevant part only.

4. Since July 19, 2021, DARNELL JACKSON was the target of an FBI investigation for his role in actively contracting the murder of "PERSON-1" while using an

AT&T cellular telephone with number 267-252-7149 ("TELEPHONE 1") in furtherance of the intended murder of PERSON-1.

5. During this investigation, your affiant received information about JACKSON from a confidential source ("CS-1"), who has been a reliable source of information from March 2017 to July 2019, and then again from November 2020 to the present. CS-1 has previously provided information and conducted controlled purchases of narcotics that have resulted in arrest and search and seizure warrants yielding the confiscation of firearms, narcotics, and U.S. currency. CS-1 is cooperating in exchange for monetary compensation.

## II. PROBABLE CAUSE FOR ISSUANCE OF COMPLAINT AND ARREST WARRANT

### A. Murder-for-Hire

6. On July 19, 2021, CS-1 advised that JACKSON is a drug trafficker[1] who is part of a violent street gang that sells narcotics in southwest Philadelphia.[2] On that date, CS-1 engaged in a series of text message and voice call exchanges with JACKSON, who was using TELEPHONE 1. JACKSON sent CS-1 a photograph of a black male wearing a maroon shirt and black baseball hat (PERSON-1). The photo of PERSON-1 appeared to be a screen shot from social media. CS-1 then had a phone conversation with JACKSON over TELEPHONE 1. According to CS-1, during their conversation, JACKSON inquired about the text message containing the photograph of PERSON-1. According to CS-1, JACKSON informed CS-1, in

---

[1] JACKSON has prior criminal convictions, including voluntary manslaughter and aggravated assault in 1998, carrying a firearm in public without a license in Philadelphia in 1991, distribution of a controlled substance in 1991, and possession of a controlled substance in 1993 and 1994.

[2] Based on search warrant executions in Philadelphia within the last week, I am aware of several houses used by JACKSON's organization that contained fentanyl, firearms and a "pill press" used to manufacture counterfeit oxycodone/fentanyl pills.

3

substance, that he wanted PERSON-1 dead and that he would pay $5,000 to CS-1 if CS-1 killed PERSON-1. CS-1 relayed this information to your affiant on the same day.

7. On July 20, 2021, in a controlled call setting under the supervision of law enforcement, CS-1 contacted JACKSON on TELEPHONE 1 to discuss the contract JACKSON had proposed for CS-1 to murder PERSON-1 in exchange for money. This conversation was audio recorded by the FBI and the following is a transcription of their conversation:

> JACKSON: All is well, what's up with you?
>
> CS-1: Man, I'm doing my homework, man I got my pup, man we ready to go. I ain't even tell him who you was or nothing you know what I mean. It's all me. I ain't going to include you in nothing. I just need to know what you want me to do.
>
> JACKSON: Right, locate…
>
> CS-1: You want me to locate, you want me to handle when I locate?
>
> JACKSON: Mmm, absolutely!
>
> CS-1: Alright what's that number you know I got to break my pup down, know what I mean, what's the payout, you know what I mean?
>
> JACKSON: Five, five.
>
> CS-1: Five. Alright listen, alright listen, cause my pup, like, we need that bread, man like, listen, even if you can do a little down payment so I can feed him something. And, I need a jawn, I need a jawn. Like we ready to go I have been doing my homework.
>
> JACKSON: I can't do all that, I can't do all that.
>
> CS-1: Alright, well I'll get that, I'll handle that. I'll handle that. Don't worry about that.
>
> JACKSON: I need to get off the phone, do what you got to do.
>
> CS-1: Alright, got you.

4

8.      Based on the conversation detailed above, I believe that the exchange between JACKSON and CS-1 was a continuation of the conversation they had about JACKSON wanting to commission CS-1 to murder PERSON-1 on July 19, 2021.  During this conversation, CS-1 referred to his "pup," a fictitious acquaintance who CS-1 had recruited to assist with the murder of PERSON-1.  Your affiant worked with CS-1 to build a narrative during his conversation with JACKSON that CS-1 had sought the assistance of an acquaintance to commit the murder of PERSON-1.  When CS-1 asked JACKSON whether he wanted CS-1 to "handle when I locate," and JACKSON replied "absolutely," CS-1 advised that JACKSON was acknowledging that he wanted CS-1 and his "pup" to kill PERSON-1 once they located him.  Further, when CS-1 asked JACKSON for "that number . . . what's the payout[?]," CS-1 was asking JACKSON to confirm how much he would pay CS-1 and his acquaintance to kill PERSON-1.  Based on their prior communication, CS-1 interpreted JACKSON's reply of "Five, five," to mean that JACKSON would pay $5,000 to CS-1 to commit the murder.  When CS-1 asked for a "little down payment" and stated that he needed "a jawn," CS-1 was asking JACKSON to provide some of the money up front and supply a firearm (jawn) to commit the murder.  JACKSON responded that he "can't do all that," but then stated: "do what you got to do."  CS-1 interpreted JACKSON's response to mean that he could not provide a firearm for CS-1 and his acquaintance to use for the killing.

9.      Shortly after their phone conversation, JACKSON used TELEPHONE 1 to communicate with CS-1 again.  They agreed to meet at CS-1's residence in Philadelphia to further discuss the details and planning of JACKSON's contract for CS-1 to murder PERSON-1.  CS-1 also asked JACKSON for $500 as a down payment for the killing.

10.     Later in the evening of July 20, 2021, CS-1 spoke again with JACKSON who was

5

using TELEPHONE 1.  The conversation was audio recorded.  Based on your affiant's review of the recording, during their conversation, JACKSON advised CS-1, in substance, that they would meet the following day, on July 21, 2021, at CS-1's house in Philadelphia at which time they would further discuss the plan for CS-1 to kill PERSON-1.  JACKSON also mentioned he would be bringing a friend with him to their meeting and that he also wanted to discuss locating PERSON-1's close friends so that they could be harmed as well.

11. Based on the foregoing, on July 21, 2021, your affiant applied for a search warrant authorizing the collection of cell-site ("ping") and related data on TELEPHONE 1 to assist law enforcement in their efforts to locate JACKSON.  On that date, the Honorable Richard A. Lloret, U.S. Magistrate Judge in the Eastern District of Pennsylvania, authorized the search warrant.  *See* Mag. No. 21-mj-1184 (filed under seal).

12. On July 21, 2021, at 2:26 p.m., CS-1 met with JACKSON near CS-1's residence in Philadelphia.  The meeting was audio-recorded under the direction and supervision of law enforcement.  During this in-person meeting, CS-1 requested a down payment from JACKSON so that CS-1 and his associate ("pup") could commit the murder of CS-1.  JACKSON refused to pay any amount in advance, declaring "Loyalty over royalty."  CS-1 advised that he understood this to mean that JACKSON would only pay him once the murder of PERSON-1 was completed.  During their conversation, CS-1 asked JACKSON: "Do you want me to kill this [N-word]?"  JACKSON responded: "Yes."  Later in their conversation, JACKSON went on: " Hit that [N-word] with anybody except for kids and [a female who was specifically named but omitted for purposes of this affidavit]."

13. A few hours later, at approximately 5:38 p.m., under the direction and supervision

6

of law enforcement, CS-1 placed a consensually recorded call to JACKSON on TELEPHONE 1.

The following is a transcription of their conversation:

| | | |
|---|---|---|
| JACKSON: | | Give me some good news. |
| CS-1: | | Yeah this the good news, right? I just grabbed the situation right, I got the drop. Listen, listen hear me out, I just grabbed the situation I know where he gonna be at tonight. I got him, listen. When the job done, I just need 55 to be reimbursed for my joint. That's it. After it's done, after it's done. |
| JACKSON: | | You aint' say that. Stop playing yo. Stop playing. |
| CS-1: | | After it's done. |
| JACKSON: | | You don't wanna [unintelligible] with a big fella like that. |
| CS-1: | | I love you man, I got you. You ain't got to say no more, I got you. |
| JACKSON: | | Hold on, hold on. You said you know where he gonna be at tonight. |
| CS-1: | | I know where he gonna be at. I got the drop now. Getting the details on his phone. Shit, you taught me better than that. |
| JACKSON: | | Haha! [laughter] |
| CS-1: | | You taught me better than that. |
| JACKSON: | | What you want? What you want? |
| CS-1: | | I'm just telling you, I want 55 to be reimbursed for the jawn. When it's over with, like you said: "loyalty." I'm a show you, I'm on your team. |
| JACKSON: | | Alright! [laughter] |
| CS-1: | | I'm a show you. |
| JACKSON: | | [unintelligible] Youngin! |
| CS-1: | | I just need to, I just need to give that youngin' that pound back for that joint. |
| JACKSON: | | I got it. |

7

| | |
|---|---|
| CS-1: | Say that man, I got you. I got you. When that shit done. |
| JACKSON: | [unintelligible] |
| CS-1: | Nah, I ain't getting into all that. When you get that call, we gonna do all that. |
| JACKSON: | Alright. |
| CS-1: | You taught me better than that. |

[voices overlap]

| | |
|---|---|
| JACKSON: | Alright baby. |
| CS-1: | C'mon you going against your own rules. |
| JACKSON: | Alright [unintelligible] man. |
| CS-1: | Alright, I got you.  I love you, Unc. |

14.     Based on the conversation detailed above as well as my debriefing of CS-1, I believe that this discussion over TELEPHONE 1 between JACKSON and CS-1 was about setting up the murder of PERSON-1 on the evening of July 21, 2021, and the increase in price that CS-1 wanted because CS-1 was supplying his own firearm instead of obtaining one from JACKSON to commit the murder.   For instance, when CS-1 relayed the "good news" to JACKSON, CS-1 informed JACKSON that he obtained a firearm ("grabbed the situation") and that he knew where PERSON-1 would be that evening.  CS-1 then asked JACKSON for "55" (or $5,500) to be reimbursed for purchasing the firearm ("my joint").  As stated above, during their earlier conversation on July 20, 2021, when CS-1 asked JACKSON for the "payout" (or the amount he would receive for killing PERSON-1), JACKSON replied: "Five" (or $5,000).   When CS-1 again told JACKSON that he wanted "55 to be reimbursed for the jawn . . . when it's over with," CS-1 was demanding $5,500 from JACKSON once the murder was completed, which was

8

$500 more than initially agreed upon; but, now, CS-1 had to supply his own firearm ("jawn") and he wanted reimbursement for the costs associated with the purchase. In response to this, JACKSON simply stated "Alright," while laughing. Based on my listening to this recording and my discussions with CS-1 about this conversation with JACKSON over TELEPHONE 1, I believe that JACKSON agreed to pay $5,550 to CS-1 to murder PERSON-1 on the evening of July 21, 2021.

15. At approximately 9:20 p.m., TELEPHONE 1's ping coordinates placed JACKSON in the vicinity of 60th and Market Streets in Philadelphia. A short time later, TELEPHONE 1 was in the vicinity of 34th Street and Grays Ferry Avenue in Philadelphia. Shortly thereafter, law enforcement officers established surveillance in the vicinity of 65th Street and Guyer Avenue in Philadelphia, at which time your affiant observed a parked Jeep Cherokee that JACKSON had been observed driving earlier in the investigation when he posted photos and videos of himself driving the vehicle on the social media site: Instagram.

16. At approximately 10:45 p.m., under the direction and supervision of law enforcement, CS-1 placed a consensually recorded call to JACKSON on TELEPHONE 1. CS-1 advised JACKSON that he had murdered PERSON-1. JACKSON replied, in substance, that he was on his way to pay CS-1 the money.

### B. Possession of Ammunition by a Felon

17. At approximately 10:50 p.m. on July 21, 2021, JACKSON was approached by Philadelphia Police Officers in the vicinity of 65th Street and Guyer Avenue during a traffic stop so that he could be arrested based upon probable cause for the federal crime of murder-for-hire, in violation of 18 U.S.C. § 1958. At the time of the stop, JACKSON was driving the above

9

mentioned Jeep Cherokee and was the sole occupant in the driver's seat. When officers approached JACKSON in his vehicle, JACKSON possessed in his lap between his legs a semi-automatic Glock-style privately made firearm ("PMF") loaded with 16 live rounds of Speer Luger 9mm ammunition. Also at the time of his arrest, JACKSON was in possession of TELEPHONE 1; I later dialed the number for TELEPHONE 1 (267-252-7149) and observed and heard it ringing while it was in my possession.

18. On or about September 23, 1998, in the Pennsylvania Court of Common Pleas in Philadelphia County, JACKSON was convicted of aggravated assault (CP-51-CR-0901491-1997), a crime punishable by more than one year in prison. JACKSON was sentenced to a term of 7 to 15 years' imprisonment on that conviction. Under federal law, JACKSON is prohibited from possessing ammunition and firearms.

19. I know that the Speer Luger ammunition recovered from JACKSON's Glock-style PMF is not manufactured in the Commonwealth of Pennsylvania, but in Idaho, resulting in the ammunition having travelled in and affected interstate commerce.

## III. <u>CONCLUSION</u>

20. Based on all of the foregoing, your affiant submits that there is probable cause to conclude that DARNELL JACKSON: (1) used an instrumentality of interstate commerce (TELEPHONE 1) to commission the murder of PERSON-1 in violation of the laws of the Commonwealth of Pennsylvania, in exchange for a promise and agreement to pay something of pecuniary value (U.S. currency), in violation of 18 U.S.C. § 1958 (use of interstate commerce facilities in the commission of murder-for-hire); and (2) upon having been previously convicted in the Commonwealth of Pennsylvania of a crime punishable by more than one year in prison,

possessed ammunition, which traveled in and affected interstate commerce, in violation of 18 U.S.C. § 922(g)(1) (possession of ammunition by a felon).

    I submit this application based upon my information and belief upon the facts set forth to the best of my knowledge.

Respectfully submitted,

/s/ John Krewer
John Krewer, Task Force Officer
Federal Bureau of Investigation

Sworn before me this  22nd  day of July, 2021.


/s/ Richard A. Lloret
_____
HON. RICHARD A. LLORET
UNITED STATES MAGISTRATE JUDGE